# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
### THIRD DIVISION

UNITED STATES OF AMERICA,

Criminal No. 06-129  PJS/AJB

Plaintiff,

v.

**REPORT AND RECOMMENDATION**

(1)    STANLEY LENIER BILLUPS, and
(2)    ROBERT DEREK BURGESS,

Defendants.

W. Anders Folk, Esq., Assistant United States Attorney, for the plaintiff, United States of America;

Virginia G. Villa, Esq., Assistant Federal Defender, for defendant, Stanley Lenier Billups;

Mary M. Mateer, Esq., for defendant, Robert Derek Burgess.

This action came on for hearing before the Court, Magistrate Judge Arthur J. Boylan, on June 6, 2006, at the U.S. Courthouse, 300 South Fourth St., Minneapolis, MN 55415.  The Court issued an Order on Motions dated June 7, 2006, reserving motions to suppress statements and search and seizure evidence, motions for severance, and motion for dismissal of forfeiture count for submission to the district court on report and recommendation.

Based upon the file and documents contained therein, along with witness testimony and exhibits received at hearing, the Magistrate Judge makes the following:

**Findings**

Minnesota State Highway Patrol Officer Scott Schneider was on mid-afternoon patrol

duty on April 19, 2006, on U.S. Interstate Hwy. 35 when he made the vehicle stop that is the subject

of this prosecution.  The trooper had been observing traffic while parked crosswise in the median at a

location in Freeborn County in extreme southern Minnesota near the intersection of Interstate Highway

35 and Interstate Highway 90.  Trooper Schneider is a canine handler and was working as part of a

saturation patrol project in which several officers concentrated patrol efforts on a particular stretch of

highway with the aim of making a significantly greater number of stops.[1]  Trooper Schneider observed a

group of vehicles pass by him on northbound I-35, near mile marker 13, and he pulled out to follow

and observe them.  He caught up to the group within approximately one mile at which time he observed

that the vehicles were passing a Chrysler Pacifica with Colorado plates that was cruising in the right lane

at a speed of 65 to 67 miles per hour, slightly under the 70 mph posted limit.

The officer likewise passed the Pacifica, a station wagon type vehicle, and noted that

the rear windows were tinted, though the windshield and front side windows were not tinted.  He

believed that some of the windows were perhaps darker than allowed on a Minnesota registered

vehicle, but that there was no violation of Minnesota law because the vehicle was from another state.[2]

The trooper also observed that the driver had both hands on the steering wheel and his car seat was

slid back so that his head was obscured by the door pillar.  The Pacifica driver did not turn to make

---

[1]  Trooper Schneider testified that he makes four to eight traffic stops on a typical workday.
(Hr'g Tr. 13-14, June 6, 2006)  He generally makes ten to twenty stops on a saturation detail
workday. Id.

[2]  The trooper had a window tint testing device available to him, but he did not subsequently
check the tint because he was not basing his ultimate decision to stop the vehicle on a violation of
Minnesota law regarding window tinting, though he does reference heavy tinting as an "indicator" of
criminal activity.

eye contact with the officer as he passed.  The driver, defendant Stanley Lenier Billups, is an African-American individual.  The circumstances caused the trooper to consider whether criminal activity was afoot, but no violations were observed.

Trooper Schneider proceeded onward a short distance further and exited at the Clark's Grove exit at mile marker 18.  At the top of the exit ramp he stopped and made Nextel calls in an attempt to contact other patrol officers he knew to be in the area as part of the saturation patrolling.  The trooper intended to alert those officers to his suspicions regarding the Pacifica and to ask them to continue surveillance on the vehicle.  The first officer that Schneider attempted to contact could not be reached and the second officer was too far away from the scene to provide immediate assistance.  Consequently, the trooper quickly reentered the freeway and proceeded at an extremely high rate of speed in order to catch up with the Pacifica.  The officer reached the target vehicle at or near the mile 24 marker.[3]

The trooper remained behind the Pacifica and over a distance of approximately one-half mile he observed the vehicle one-time touch but not cross the fog line on the right, and thereafter twice touch but not cross the center line on the left.  It was an extremely windy day with gusts up to 29 miles per hour.  The Pacifica was still traveling below the speed limit and was behind a semi-tractor with a flatbed trailer.  The officer activated the emergency stop lights on the squad car to initiate a stop,

---

[3]  Defense counsel suggested in cross-examination questioning that based upon the trooper's estimation that he stopped approximately 30 seconds to make calls, the speed at which the Pacifica had been traveling, and the distance the officer traveled to catch up, the officer's rate of speed was likely in excess of 100 miles per hour.  The trooper acknowledged that he went very fast, but he neither admitted or denied the accuracy of the rate of speed calculation by counsel.

citing a suspicion of driver impairment.  There was no violation of traffic law based upon the weaving

itself, and the vehicle was not observed weaving at any time during the five-mile stretch before the

Clark's Corner exit during which the trooper was behind the Pacifica.  When the lights were activated

the vehicle promptly pulled to the right shoulder and stopped at or near the mile 26 marker.  They were

now in Steele County.  A squad car mounted video camera with audio was engaged upon activation of

the emergency lights.  Therefore, the stop, along with subsequent events, was tape recorded  (Hr'g Ex.

No. 2).

Trooper Schneider stopped behind the Pacifica and approached the vehicle on the

passenger side.  There was a front seat passenger that the officer had not previously observed who was

disinterestedly reading a newspaper and who continued reading the paper without looking at the

trooper.  The officer asked for a driver's license and proof of insurance and the driver, defendant

Billups, handed his license to the trooper.  The license was valid.  The trooper put his head in the

window opening and did not observe any distinctive odor, such as the smell of alcohol or marijuana, in

the vehicle.  The passenger, defendant Robert Derek Burgess, asked where insurance papers might be

located, and on suggestion by the officer he opened the glove box where two separate car rental

agreements were found, one for a Dodge Durango (Hr'g Ex. No. 5), the other for the Chrysler Pacifica

(Hr'g Ex. No. 4).  Defendant Burgess was the named rental customer and sole authorized driver on the

Pacifica rental agreement.  The written rental agreements indicated that the rental period may have

expired, but the vehicle had not been reported stolen by the rental company, Dollar Rent-a-Car.

The trooper then asked Mr. Billups to step out of the vehicle so that he could talk with

him face-to-face without competing against wind and traffic noise and yelling across the car seat, as

4

well as to check the driver's impairment and further investigate. They met at the back of the car and begin conversing. In response to questions, Billups stated that Burgess had rented the vehicle; they were coming from a car auction in Denver, Colorado; and he had known his traveling companion for "a few years" and "five years." The trooper did not detect signs of impairment. Subsequently, the passenger began calling from the vehicle window to speak with the officer. The trooper went to talk with Burgess who likewise stated that they were coming from an auto auction in Denver, but they had not bought anything and were now headed to Minneapolis.

Trooper Schneider prepared a warning citation for weaving in the traffic lane. After returning his drivers license and giving the warning to defendant Billups, the officer stated that he wanted to check the vehicle identification number on the Pacifica dash board. While he was waiting in the vehicle, defendant Burgess had called the car rental company on his cell phone, and Burgess told the trooper that the rental company representative wanted to speak with him. After some discussion on the phone the trooper informed the defendants that the rental agent had stated that the car was overdue and had asked that it be impounded. The agent also told the officer that the car would not have been reported stolen for at least another week or two. The officer spoke with Billups about impounding the vehicle and Billups offered to drive the car to Denver to avoid towing charges. Upon speaking with Burgess about impounding the car, the defendant appeared to become somewhat agitated and offered to drive the car to Minneapolis to avoid towing.

Meanwhile, BCA Special Agent Timothy Shanley arrived at the scene. Defendant Burgess was put in Trooper Schneider's squad car, and defendant Billups remained outside with Agent Shanley. There were several items of baggage in the Pacifica, and when Shanley asked which items in

the vehicle belonged to him, Billups pointed out three bags and said that two other bags belonged to

Mr. Burgess.  Trooper Schneider asked Burgess for permission to search the Pacifica and was told

"no."  Agent Shanley asked Billups for permission to search the vehicle and his consent was likewise

denied.  Nonetheless, Trooper Schneider had decided that the vehicle would be impounded and

towed, ostensibly pursuant to rental company request, and that an inventory search would be

conducted prior to towing.

In conducting the inventory search Trooper Schneider observed a case of Red Bull and

a case of Mountain Dew, both high caffeine beverages.  He also noticed two pairs of high value

sunglasses, a presumed indicator of criminal activity.  The trooper concluded that the highly caffeinated

beverages were evidence of extended periods of driving, a presumed practice of drug transporters who

wished to avoid motels and thereby leave the vehicle unattended.  The trooper also observed five

pieces of luggage in the rear cargo space, an amount of baggage that appeared excessive to him.  He

further determined that the totality of circumstances established reasonable suspicion that drugs would

be found in the vehicle, thereby justifying a canine search for drugs.[4]  Trooper Schneider retrieved his

certified drug dog Xena from the back seat of his squad car and walked the dog around the Pacifica.

The dog indicated the presence of the odor of drugs by scratching on the back and right rear side of the

vehicle.  Based upon this additional dog-sniff evidence the officers engaged in a further search of the

Pacifica and discovered six kilograms of cocaine hidden behind a panel in the rear cargo area and one

---

[4]  Trooper Schneider testified that he had asked each defendant for consent to search the
vehicle to be "polite," because he believed he already had reasonable suspicion to conduct the dog sniff
search.

additional kilogram under the air cleaner cover under the front hood.  Defendant Billups and defendant

Burgess were then placed under arrest.

After the dog sniff and while the vehicle search was taking place defendant Burgess

remained in Trooper Schneider's squad car.  During this time, Mr. Burgess made cell phone calls on

which his voice was recorded  (Hr'g Ex. No. 3).  In addition, Burgess made statements to his backseat

companion Xena, which were also recorded.  The statements were not provided in response to

questioning by officers.

Following the arrest, both defendants were placed in Special Agent Shanley's vehicle

for transport to the Steele County Jail in Owatonna, Minnesota.  Defendants were given the <u>Miranda</u>

warning.  They declined to talk with the agent and were not thereafter interviewed or asked questions

about matters relating to the stop and arrest.

Based upon the foregoing Findings, the Magistrate Judge makes the following:

<u>Conclusions</u>

**Severance.**  Severance of defendants is not required in this matter.  Defendants

Stanley Lenier Billups and Robert Derek Burgess have both moved for severance for separate trials in

this matter.  FED. R. CRIM. P. 8(a) permits joinder of offenses in the same indictment if the offenses are

of the same or similar character, or are based on the same act or transaction, or are based on acts

connected together or constituting parts of a common scheme or plan.  The propriety of joinder under

Rule 8(a) is a question of law, though relief from a legally permissible joinder may be obtained as an

exercise of discretion on motion for severance due to prejudice, pursuant to FED. R. CRIM. P. 14.

<u>United States v. Rodgers</u>, 732 F.2d 625, 628-29 (8th Cir. 1984).  Availability of the Rule 14 remedy

permits broad construction of Rule 8 in favor of initial joinder.  Id. at 629.  With respect to joinder of

defendants in this instance, it has not been shown that severance of co-defendants is necessary to avoid

risk of compromising any specific trial right to which each of them is entitled or is necessary to prevent

the jury from making an unreliable judgment as to the guilt or innocence of each of them.

The individual co-defendants in this matter have been indicted for conspiring with one

another to distribute and to possess with intent to distribute cocaine.  In addition, the indictment alleges

that the co-defendants aided and abetted one another to possess with intent to distribute cocaine.  Two

or more defendants may be charged in the same indictment if they are alleged to have participated in the

same transaction or series of incidents constituting an offense or offenses.  FED. R. CRIM. P. 8(b).

There is a preference in the federal system for joint trials of defendants who are indicted together.

Zafiro v. United States, 506 U.S. 534, 113 S.Ct. 933, 937 (1993).  Persons charged with conspiracy

should generally be tried together and it will rarely be improper for co-conspirators to be tried together.

United States v. Kindle, 925 F.2d 272, 277 (8th Cir. 1991); United States v. Stephenson, 924 F.2d

753, 761 (8th Cir. 1991)(cert. denied 502 U.S. 813 (1991)).  Nonetheless, the court may grant a

severance of defendants if it appears that a defendant is prejudiced by a joinder of defendants at trial.

FED. R. CRIM. P. 14.  A court "should grant a severance under Rule 14 only if there is a serious risk

that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury

from making a reliable judgment about guilt or innocence." Zafiro, 113 S.Ct. at 938.

Both of the defendants generally assert prejudice resulting from the introduction of

evidence against one of them that would be inadmissible against the other in a separate trial.  Each

defendant also contends that his Fifth Amendment right not to incriminate himself would be jeopardized

by joinder of trials, and that his Sixth Amendment right to confront and cross-examine witnesses would be threatened in a joined trial.  Defendant Burgess does not describe grounds for severance with any factual particularity.  Defendant Billups bases his request on his inability to cross-examine defendant Burgess with respect to recorded comments made by Burgess while he was being detained in the back seat of the trooper's vehicle.  More specifically, Mr. Billups contends that Burgess' statements will likely be offered by the government at trial and therefore Burgess ought to be subject to the Sixth Amendment right of confrontation.  There are no claims of possible jury confusion, antagonistic defenses, or guilt transference by either defendant.

The counts and defendants in this case were properly joined under Rule 8 and there is requirement for severance based upon misjoinder.  Rule 14 severance is a remedy for prejudice that may develop during trial, and the decision on a Rule 14 motion for severance lies within the sound discretion of the trial court.  United States v. Robaina, 39 F.3d 858, 861 (8th Cir. 1994).  The record, including testimony produced at hearing, offers no compelling indication as to how either defendant is prejudiced by joinder with the other defendant in this case, particularly to the extent necessary to overcome the preference for joinder of defendants in conspiracy cases.  Specifically, it is not patently apparent that a jury would be unable to distinguish and apply the evidence relating to one defendant from evidence relating to the other defendant, and there has not been persuasive showing that a joined trial will prevent introduction of exculpatory evidence or will preclude clarification of arguably inculpatory statements made by defendant Burgess with regard to defendant Billups.  Joinder of defendants in this case was not improper and severance is not required in light of the current record. See United States v. Wadena, 152 F.3d 831, 847-50 (8th Cir. 1998).

With respect to possible infringement of defendant Billups' right to confront his co-defendant concerning recorded statements made by the co-defendant, the motion for severance can properly be determined at or near the time of trial at which time it can be determined whether the government will seek to introduce all or selected portions of the recorded statements, and whether Mr. Burgess will exercise his right to testify or his Fifth Amendment right.   Severance is a remedy that can be provided at the time of trial if appropriate under the circumstances.   At present the motion for severance is based upon speculative grounds and is therefore premature.

**Vehicle Stop.**   The stop of the Chrysler Pacifica that defendant Billups was driving and in which defendant Burgess was a passenger on April 19, 2006, was unlawful, and evidence obtained from the Pacifica as a result of the stop should be suppressed.   The vehicle stop by Trooper Schneider was not based upon an objectively reasonable, articulable suspicion of criminal activity.   See United States v. Martin, 411 F.3d 998, 1000 (8th Cir. 2005).   Rather, the stop was based upon mere hunch, caprice, whim or curiosity and was made in violation of the Fourth Amendment.   State v. Vereb, 643 N.W.2d 342, 346 (Minn. App. 2002)(citing State v. George, 557 N.W.2d 575, 578 (Minn 1997).

Trooper Schneider acknowledges that the vehicle stop did not follow any observed violation of traffic laws, but he asserts that the stop was lawfully based upon reasonable suspicion of driver impairment as evidenced by weaving within the lane and as further supported by a number of "indicators" of criminal activity.   Items which are cited as indicators constituting support for the stop included: the observation that the Pacifica was maintaining a rate of speed that was slightly lower than the 70-mile-per-hour speed limit; the Pacifica had Colorado plates and some its windows were

10

excessively tinted; the driver had both hands on the steering wheel and his seat was slid back so that a

view of the driver's head was obstructed by the door pillar; and the driver did not turn to look at the

trooper as he passed.

        The trooper testified at the hearing that as a result of personal experience and

classroom training he is aware that certain actions or circumstances that are not in themselves examples

of something illegal may nonetheless be "indicators" of criminal activity.  While a single indicator may

not be particularly meaningful, multiple indicators may significantly raise suspicions of criminal activity.

In short, as grounds for suspicion of illegal activity, the evidentiary whole is greater than the sum of the

individual factors.  In essence, reference to indicators is an attempt to mechanically apply some version

of the totality of circumstances analysis in the field.  While in general this multiple indicator approach to

would seem to be an appropriate exercise, it does not necessarily constitute an true assessment of

circumstances if indicators are merely totted up on a scoreboard or if all indicators are given equal

probative weight or if any indicator or multiple indicators are viewed without regard to clearly non-

inculpatory explanations.  Furthermore, reliance on indicators is especially suspect when the indicators

are not even cited in the context of a particular criminal activity.

        A traffic stop generally must be supported by at least a reasonable, articulable suspicion

that criminal activity has occurred or is taking place.  Martin, 411 F.3d at 1000.  In considering the

lawfulness of a traffic stop, the heart of the question is whether the officer had an objectively reasonable

basis for the stop.  United States v. Smart, 393 F.3d 767, 770 (8th Cir. 2005); see also United States

v. Robledo, No. 06-1439, 2006 WL 1686771, at *1 (8th Cir. June 21, 2006)(unpublished opinion).

Expressed in yet another way, when an officer's observations lead him or her to reasonably suspect

that an individual is engaged in criminal activity, the officer may stop that person to investigate the circumstances that provoke the suspicion, and an objectively reasonable basis to stop exists if the officer reasonably suspects that the driver was operating the vehicle in a manner that did not comply with state law. Smart, 393 F.3d at 770. A traffic violation, however minor, is sufficient to justify stopping the vehicle. Martin, 411 F.3d at 1000. This is the case even where the officer's suspicion was based upon a mistaken belief as to either law or fact, so long as the mistake itself was objectively reasonable. Smart, 393 F.3d at 770 (reasonable suspicion exists despite mistake of fact as to the state license plate on the vehicle and mistake of law as to the state's requirement for front and back plates). On the other hand, subjective good faith is not sufficient to justify a traffic stop because "officers have an obligation to understand the laws that they are entrusted with enforcing, at least to a level that is objectively reasonable." Martin,  411 F.3d at 1001.

      In the present case, Trooper Schneider expressly stated that the stop was not based upon his observation of a violation of a traffic law, but rather, that the Pacifica was stopped on suspicion that the driver was impaired.[5]  Consequently, whether the stop was based upon an objectively reasonable suspicion cannot be determined on the basis of a bright-line indicia of objectivity, i.e. an observed traffic violation. Instead, the court must evaluate the totality of circumstances which are cited as evidence of an impaired driver. Here, the sole circumstance offered to establish reasonable suspicion of impairment is the officer's observation of the Pacifica touching the fog line on the right, then twice touching, but not crossing, the centerline on the left over a half-mile distance. Also, the

---

[5]  Though weaving within the lane may warrant issuance of a warning ticket, and may be evidence of another offense, it is not a traffic violation.

government notes the general indicators of criminal activity that the trooper previously observed, i.e. tinted windows, driving within the speed limit and with both hands on the steering wheel, the driver's seat slid back to obscure the driver's head, and the driver's failure to make eye contact.  It is the court's conclusion that all of the observations offered by Trooper Schneider to justify the vehicle stop, considered together, were insufficient to establish an objectively reasonable suspicion of impairment, and the stop was therefore unlawful.

Moreover, considering all of the circumstances known to the trooper, including information which would not be consistent with driver impairment and the virtually nil significance of some of his indicators, the already insufficient grounds for the stop are essentially non-existent.  The trooper observed the Pacifica weaving within the lane, but such weaving was minimal, despite the existence of strong gusting winds.  No weaving had been observed in the nearly five miles in which the trooper followed the car before reaching the Clark's Grove exit.  The vehicle did not go onto the shoulder, did not hit the rumble strips, did not enter the left traffic lane, and the driver made no abrupt corrections.  While typically there is no amount of weaving that is desirable, in this instance, the conduct was not sufficient to establish an objectively reasonable suspicion of driver impairment.

The court has also considered the indicators of criminal activity cited by the trooper, as well as the cumulative significance of those indicators.  In that regard the court is exceptionally reluctant to attach any weight to the modestly under-the-limit speed of the vehicle when such driving behavior is easily attributed to speed trap considerations,[6] if not a mere willingness of many drivers to obey speed

---

[6]  The Pacifica had very recently passed Trooper Schneider's squad car parked in the freeway median.

limits and/or conserve fuel.  The court is loath to view legal and typically commendable and innocuous

behavior as an indicator of criminal activity, whether considered alone or as part of greater whole.  See

Disrud v. Comm'r of Pub. Safety, No. C8-88-281, 1988 WL 88550, at *2 (Minn. App. August 30,

1988)(unpublished opinion)(modest speed of 5 to 10 mph below 35 mph speed limit at night is not

evidence of drunken driving).  Much the same can be said about driving with two hands on the steering

wheel.  Though the trooper testified that two-handed driving may be a sign of nervousness and rigidity,

he offered no explanation as to why it evidenced excessive driver nervousness in this instance,[7] and the

court is not persuaded this indicator is a particularly important circumstance in any event.  The tinted

windshield is entirely without significance based upon the trooper's awareness that the car was licensed

in another state[8] and the car tint was therefore not unlawful.  As to the driver's seat being slid back and

the driver's head obscured, the court takes judicial notice, based upon the court's own observations at

hearing, that the driver, Mr. Billups, is a middle-aged African-American individual,[9] and his height and

---

[7]  There is no evidence as to hand placement, white knuckles, rigid arms, or other concrete indications of nervousness.

[8]  The court's record in this case contains no evidence that the trooper attempted to check the status of the vehicle's out-of-state license and registration prior to making the stop.

[9]  Both defendants in this matter are African-American men.  No exhibits received at the hearing reveal the defendants' race and neither the government nor the defendants elicited testimony at the hearing which would reveal the defendants' race.  Evidence of the defendants' race is contained in the hearing transcript only because the court made inquiry to Trooper Schneider as to whether the trooper considered race as an "indicator" of possible criminal activity in this matter.  The trooper testified that he did not consider race as an indicator or factor in the case, either by itself or in connection with identified indicators, but that he did take note that the driver appeared "sloppy, messy in a nice car."  In post-hearing memorandums neither the defendants nor the government expressly address the issue of whether race might have played a role in this case, though the defendants do make reference to their race, likely in recognition of the court's apparent concerns as to whether race was a factor in this matter and perhaps in anticipation that the court would a address a topic that it had noted

stature would allow the presumption that he would be quite comfortable driving with the seat slid back to a point at which his head would be obscured by the door pillar.  (Def. Hr'g Exh. No. 2).  Finally, the driver's failure to turn towards the passing trooper and make eye contact is utterly meaningless unless the trooper can say with certainty that the driver knew the trooper was beside him and was looking at him.[10]  Even then, determining the psychological significance of the momentary behavior is likely well beyond the expertise of the trooper, notwithstanding his experience and training in the pseudo-science of indicators.  The totality of circumstances in this case establish that at the moment he reentered the freeway at Clark's Grove, if not sooner, Trooper Schneider had already determined that he was going to stop the Pacifica, come hell or high water.  The subsequent observation of minimal weaving within the lane was a pretext for the stop and was not sufficient to establish reasonable suspicion of impairment in any event.[11]

---

at hearing was a "touchy" subject.  Of course, the immediate thought that comes to mind is whether the vehicle stop was a result of racial profiling in violation of the Fourth Amendment.  As a fact matter the court finds no objective evidence of racial profiling in this instance and therefore declines to go in that direction.  See United States v. Pulliam, 265 F.3d 736, 739-40 (8th Cir. 2001).  Indeed, the court's reason for raising the subject of race sua sponte was the paucity of objective evidence to support the stop and the trooper's heavy reliance on "indicators" of criminal activity which are not evidence of any particular criminal activity, i.e. circumstances causing the court to consider whether unspoken factors played a part in the decision to make the stop.  It was apparent by the trooper's somewhat prompt but elusive response to the court's question that he anticipated that someone might ask him about the defendants' race as a factor in this matter.  The answer was neither a previously asserted reason for the stop nor evidence of racial profiling.  In any event, the court does not now attribute a racially-based motivation to the trooper and does not fault defense counsel for the lack of inquiry regarding race.

[10]  The trooper did not testify that the driver glanced towards him and then looked away, or that he had any other objective reason to believe the driver knew he was there.

[11]  The "indicators" in this instance might have justified continued surveillance of the Pacifica to observe whether a traffic violation or other grounds for a stop might occur, but none of the indicators in this case, including post-stop indicators cited to justify continued detention, the dog-sniff search, or the

Post-warning Detention and Inventory Search.   Evidence obtained as a result of an inventory search of defendants' Chrysler Pacifica should be suppressed as the fruit of an unlawful stop. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 415-416 (1963). Alternatively, independent grounds for suppression exist as the trooper lacked reasonable, articulable suspicion of criminal activity or other lawful reasons on which to justify defendants' detention following issuance of a warning ticket. In addition, the trooper had no lawful grounds to impound or to conduct an inventory search of the vehicle.  The vehicle stop of the Pacifica was unlawful and any evidence obtained as a result of the stop is fruit of a poisonous tree.

Moreover, even if the stop was found to be lawful, the detention of the defendants following issuance of a warning ticket was in violation of the defendants' Fourth Amendment right in their persons to be secure from unreasonable seizure.  United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001).  A Fourth Amendment intrusion must be carefully tailored to its underlying justification meaning the intrusion must be temporary and last no longer than necessary to effectuate the purpose of the stop.  Id.  A driver may be detained as long as needed to check the validity of a drivers license and registration, check the driver's criminal history and determine whether there are outstanding warrants, inquire as to destination and purpose of travel, and determine whether the vehicle is stolen.  Id. at 924-25.   It is an unreasonable extension of the scope of the investigation to detain the vehicle after issuance of a ticket, unless something has occurred during the stop to create reasonable suspicion of criminal

_____

post-arrest roadside search, are sufficient as evidence to support the resulting action by Trooper Schneider.  Most if not all of the observations which are cited as indicators in this case are not direct evidence of criminal activity at all.

16

activity.  Id. at 925.   Continuation of an encounter after an officer issues a ticket may be consensual in

light of the facts of the particular case, but a person is seized under the Fourth Amendment if under all

the circumstances a reasonable person would not have believed he was free to leave.  Id.

In the present case, the trooper gave a warning ticket to the driver, but did not tell him

he was free to leave, an oral notification that would suggest that any continued encounter was

consensual rather than mandatory.  See Jones, 269 F.3d at 925.  Instead, the trooper stated that he

wanted to check the VIN number of the Pacifica, and he again put himself inside the vehicle.  At that

time the defendant passenger, Mr. Burgess, was speaking with the car rental company on a cell phone,

and he gave the phone to the trooper to speak with the rental company.  The trooper testified that in the

ensuing conversation the rental company agent asked him to impound the Pacifica.  However, the

officer already knew that the vehicle had not been reported stolen, and the status of the vehicle was

confirmed by the rental agent.  Equally important, the trooper had examined the rental agreements prior

to issuing a warning ticket to the Pacifica driver, and despite any questions he may have entertained

about those documents, the trooper had concluded that they did not provide grounds to detain the

defendants for the purpose of investigating criminal activity with respect to either the authorized driver

designations or expiration of the rental agreement.  Based solely upon the rental agent's request,

Trooper Schneider determined that the car would be impounded and an inventory search would be

conducted.  The decision to impound and to undertake an inventory search was not based upon a

contention that the vehicle was stolen or on any other objective, articulable suspicion of criminal activity.

The impoundment was based entirely upon a telephone request that the trooper perform a civil function,

i.e. enforce a car rental agreement.  Indeed, the trooper was advised that the vehicle would not have

been reported stolen for at least several more days, if in fact the car was overdue.  Under these circumstances the court does not conclude that the rental agent's request for impoundment can properly be construed as an event occurring during the stop that created a reasonable suspicion of criminal activity, and the trooper therefore had no justification for continuing detention to permit impoundment or inventory search.[12]   Evidence obtained in the Pacifica inventory search, consisting of the officer's

---

[12]   Issue could perhaps be raised in this matter as to whether exclusion of evidence in a federal prosecution is appropriate where the evidence was obtained as a result of an officer's violation of due process in regards to civil law enforcement, as opposed to violation of constitutional law in a criminal investigation.  A police officer's involvement in the repossession of property by a private party can constitute police intervention and aid sufficient to establish state action as required for a viable claim under the Civil Rights Act of 1871 and Section 1983.  The impoundment of an arguably overdue rental vehicle is substantially analogous to repossession.  Typically, officers are not state actors in a private repossession if they are present only to keep the peace, but they are state actors if they affirmatively act to aid the repossessor.  Marcus v. McCollum, 394 F.3d 813, 818 (10th Cir. 2004).  Repossession without judicial process may be an unlawful breach of the peace whenever the action takes place over the objection of the party in possession.  See Minn. Stat. § 336.9-609(b)(2)(2004); see also Clarin v. Minnesota Repossessors, Inc., 198 F.3d 661, 664 (8th Cir. 1999)(discussing five factors for determining a repossession breach of peace).  "It stands to reason that police should not weigh in on the side of the repossessor and assist an illegal repossession.  A 'curbside courtroom,' in which officers decide 'who was entitled to possession, is precisely the situation and deprivation of rights to be avoided."  Id. at 820 (quoting Abbott v. Latshaw, 164 F.3d 141, 149 (3rd Cir. 1998)).  The defendants generally allege the officer's civil impoundment of the Pacifica as grounds for suppression, but offer little in the way of legal argument.  The government simply does not address the matter, but matter-of-factly contends that impoundment of overdue rental cars is "standard operating policy."  Importantly, no evidence of state patrol policy was presented with respect to impoundment, and without further explanation the court is at a loss to understand why a law enforcement officer would interject himself into purely contractual affairs in a highly significant manner so as to essentially strand the car renters, based upon a phone conversation initiated by the renter himself in an apparent attempt to clear up a misunderstanding regarding the vehicle.  If indeed impoundment is standard policy of either Trooper Schneider or the Minnesota Highway Patrol, the agency might reconsider the lawfulness of such policy, or at least establish some concrete written policy describing circumstances under which impoundment may or may not be appropriate, particularly when the action is based merely upon the rental agent's telephonic request.  Also, under the circumstances presented in this case the court questions whether the possibility of effecting an impound may have been made at the trooper's prompting.

observation of a case of Red Bull, a case of Mountain Dew, and two pairs of expensive sunglasses, should be suppressed.

**Dog Sniff Search.**  Evidence obtained as a result of a narcotics-detection dog sniff around an automobile was fruit of an unlawful stop and the fruit of an unlawfully extended detention, and the evidence should be suppressed.  While recognizing the lack of uniformity in regard to the standard to be applied to dog sniffs of automobiles, the Minnesota Supreme Court interpreted federal law to require a reasonable articulable suspicion of drug-related criminal activity.  State v. Wiegand, 645 N.W.2d 125, 135 (Minn. 2002).  Subsequently, however, it has been determined that the use of a drug-sniffing dog on the exterior of a motor vehicle during a valid traffic stop does not infringe upon Fourth Amendment rights.  United States v. Williams, 429 F.3d 767, 772 (8th Cir. 2005)(citing Illinois v. Caballes, 543 U.S. 405, 125 S.Ct. 834, 837-38 (2005)).  In this instance, the dog sniff was not conducted during a valid traffic stop or valid detention for reasons previously discussed with respect to those issues.  Consequently, dog sniff evidence, i.e. the detection of the odor of narcotics as manifested by Xena's aggressive reactions at certain places on the Pacifica, should be suppressed.

**Automobile Search.**  Evidence obtained as a result of a full search of the Chrysler Pacifica that defendant Billups was driving and in which defendant Burgess was a passenger on April 19, 2006, was fruit of an unlawful stop and the fruit of an unlawful detention and the evidence should be suppressed.  However, evidence obtained as a result of the dog sniff was sufficient to establish probable cause that evidence of drugs would be found in the vehicle.  In the event that the district court

---

determines that the stop was lawful, detention was lawful, and the dog search was lawful, suppression of evidence obtained as a result of the search would not be required.

**Statements.**  Audio recordings of statements by defendant Burgess while seated in a squad car on April 19, 2006 (Hr'g Ex. No. 3), were fruit of an unlawful stop and the fruit of an unlawful detention and should be suppressed.  Nonetheless, the statements were not unlawfully obtained in violation of the defendant's rights under Miranda.  The statements were spontaneous and were not a consequence of police interrogation; they were not the result of defendant's will being overborne through police coercion or pressure; and they were not otherwise obtained in violation of the defendant's Fifth Amendment privilege against self-incrimination or other rights under Miranda.  United States v. Waloke, 962 F.2d 824, 829 (8th Cir. 1992).  Suppression of statements on independent grounds, apart from being fruit of a poisonous tree, is not required.

**Motion to Dismiss Forfeiture Court.**  The forfeiture count in the indictment in this matter should be dismissed.  Defendant Billups moves to dismiss the forfeiture count in the indictment on grounds that the indictment does not describe property subject to forfeiture with sufficient particularity.  FED. R. CRIM. P. 7(c)(2) states that "[n]o judgment of forfeiture may be entered in a criminal proceeding unless the indictment or the information provides notice that the defendant has an interest in property that is subject to forfeiture in accordance with the applicable statute." The indictment in this instance merely alleges a claim for forfeiture which includes no allegation that defendant Billups has property that is subject to forfeiture.  Also, the indictment does not particularly identify any property that is subject to forfeiture.  The forfeiture allegation in the indictment does not satisfy the notice requirement of FED. R. CRIM. P. 7(c)(2) in any meaningful sense and should be

dismissed.  See  United States v. Loe, 248 F.3d 449, 464 (5th Cir. 2001).

Based upon the foregoing Findings and Conclusions, the Magistrate Judge makes the

following:

## RECOMMENDATION

The Court **hereby recommends** that:

1.  Defendant Stanley Lenier Billups' Motion to Suppress Evidence Obtained as a

Result of Search and Seizure be **granted** [Docket No. 25];

2.  Defendant Billups' Motion to Suppress Statements, Admissions and Answers be

**granted**  [Docket No. 26];

3.  Defendant Billups' Motion to Dismiss Forfeiture Allegations be **granted**  [Docket

No. 27];

4.  Defendant Billups' Motion for Severance of Defendants be **denied**  [Docket No.

29];

5.  Defendant Robert Derek Burgess' Motion for Suppression of Confessions,

Admissions, or Statements in the Nature of Confessions or Admissions be **granted**  [Docket No. 42];

6.  Defendant Burgess' Motion to Sever be **denied**  [Docket No. 43]; and

7.  Defendant Burgess' Motion to Suppress Evidence Obtained as a Result of Search

and Seizure be **granted**  [Docket Nos. 37 and 44].

Dated:   ____June 29, 2006_____

                                                                s/ Arthur J. Boylan_____
                                                                Arthur J. Boylan

United States Magistrate Judge


Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before July 13, 2006.


Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within ten days of receipt of the Report.