UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 06-129 (PJS/AJB) |
| Plaintiff, | |
| v. | MEMORANDUM OPINION AND ORDER ON MAGISTRATE JUDGE'S JUNE 29, 2006 REPORT AND RECOMMENDATION |
| (1) STANLEY LENIER BILLUPS and (2) ROBERT DEREK BURGESS, | |
| Defendants. | |

W. Anders Folk, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for plaintiff.

Virginia G. Villa, Assistant Federal Defender, FEDERAL PUBLIC DEFENDER'S OFFICE, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415, for defendant Stanley Lenier Billups.

Mary M. Mateer, MATEER LAW OFFICE, 2424 34th Avenue South, Minneapolis, MN 55406, for defendant Robert Derek Burgess.

This matter comes before the Court on the Government's Objections to the June 29, 2006 Report and Recommendation of Magistrate Judge Arthur J. Boylan ("Government's Objections"). In his report, Judge Boylan recommended that "[t]he stop of the Chrysler Pacifica that defendant [Stanley Lenier] Billups was driving and in which defendant [Robert Derek] Burgess was a passenger on April 19, 2006, was unlawful, and evidence obtained from the Pacifica as a result of the stop should be suppressed." Report and Recommendation 10 (June 29, 2006). The government does not object to any of Judge Boylan's factual findings, but rather objects to his conclusion that the search of defendants' car was unlawful. Under 28 U.S.C. § 636(b)(1) and Fed. R. Crim. P. 59(b)(3), this Court must consider the matter de novo.

The Court has done so.  The Court has not only read Judge Boylan's report and all of the papers filed by the parties, but the Court has read the transcript of the June 6, 2006 suppression hearing ("Tr.") and watched the videotape of the April 19, 2006 stop and search of defendants' car.  The Court is aware that suppressing the evidence in this case will likely make it impossible for the government to prosecute two men who may be guilty of serious crimes.  This is not a step that the Court takes lightly.  Nevertheless, based on its own review of the evidence, the Court agrees with Judge Boylan that the stop of defendants' car was unlawful, and the Court orders that the evidence discovered as a result of that stop be suppressed.

Judge Boylan's report is thorough and careful and the Court adopts it, insofar as it addresses the lawfulness of the stop of defendants' car.[1]  "A traffic stop generally must be supported by 'at least a reasonable, articulable suspicion that criminal activity has occurred or is occurring.'"  *United States v. Martin*, 411 F.3d 998, 1000 (8th Cir. 2005) (quoting *United States v. Fuse*, 391 F.3d 924, 927 (8th Cir.2004)).  The Court agrees with Judge Boylan that Trooper Schneider did not have such a suspicion regarding defendants' car prior to the time that Trooper Schneider left Interstate Highway 35 at the Clark's Grove exit.

The government cites various "indicators of criminal behavior," Government's Objections 5, observed by Trooper Schneider before he exited at Clark's Grove, including (1) the fact that Billups was driving slightly under the 70-miles-per-hour speed limit (Trooper Schneider estimated Billups's speed as 65 to 67 miles per hour, Tr. 52),  (2) the fact that the car driven by

---

[1]Judge Boylan found that, even if the stop of defendants' car was valid, the evidence must nevertheless be suppressed for other reasons.  Because the Court concludes that the stop of defendants' car was not valid, the Court need not address the portions of Judge Boylan's report relating to those alternative grounds.

Billups had tinted back windows (the tinting was legal, as the car was licensed in Colorado), (3) the fact that Billups drove with two hands on the steering wheel, (4) the fact that Billups's seat was pushed back so that Billups's head was obscured by the "B" pillar separating the driver's side windows, and (5) the fact that Billups did not make eye contact with Trooper Schneider when the latter passed him.  For the reasons described by Judge Boylan, these lawful and common actions did not — either individually or taken together — give Trooper Schneider a reasonable, articulable suspicion that the occupants of defendants' car had engaged in or were engaging in criminal activity.

      The Court, like Judge Boylan, is loathe to find that a driver gives the police reason to pull him over when he drives slightly under the speed limit *after passing a state trooper parked in the median* — a state trooper who then pulls out and follows him.  (The case might be different if Billups had been driving 15 or 20 miles under the speed limit or if Billups did not have reason to believe that a state trooper was in the vicinity.)  Likewise, the Court is loathe to hold that a driver who uses two hands on the wheel (something that drivers-education students are taught to do) or a tall driver who pushes back the driver's seat (something that promotes both safety and comfort) or a driver who owns a car with a lawful degree of window tinting (something that presumably millions of Americans do) provides evidence of criminal activity.  It is also not clear to the Court why failing to make eye contact with a passing trooper is any more indicative of criminal activity than *making* eye contact.  The latter would seem to provide at least as much evidence of a guilty conscious as the former.  Moreover, keeping one's eyes on the road — a good idea as a general matter — would seem to be particularly wise when one is driving side-by-side with a police car.

The Court recognizes that, "[i]n evaluating the validity of a stop such as this, [it] must consider 'the totality of the circumstances — the whole picture.'" *United States v. Sokolow*, 490 U.S. 1, 8 (1989) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).  The Court also recognizes that instances of conduct that each appear innocent in isolation might appear quite suspicious in combination.  *See United States v. Arvizu*, 534 U.S. 266, 274-75 (2002).  But the sum is not always greater than the parts.  Sometimes, as in this case, zero plus zero plus zero adds up to zero.[2]

Likewise, the Court recognizes that Trooper Schneider was entitled to draw on his experience and training to make "inferences and deductions that might well elude an untrained person." *Cortez*, 449 U.S. at 418.  But deferring to the judgment of experienced and highly trained law enforcement officers cannot cross the line into abdicating the judicial function.  Moreover, even complete deference to Trooper Schneider would not help the government on this point, as the trooper himself admitted that he did not have legal justification to stop defendants' car prior to exiting at Clark's Grove.[3]

---

[2]The Court also notes that there is a bit of a "heads I win, tails you lose" dimension to some of the government's arguments.  For example, the government argues that both driving slightly over the speed limit (a traffic violation) and driving slightly under the speed limit (evidence of a guilty conscience) give law enforcement officers justification to stop a car.  One wonders, then, at what speed a citizen can drive without subjecting himself to being pulled over.

[3]At the June 6 hearing, Trooper Schneider was asked why he did not stop defendants' car before the Clark's Grove exit:

> Q: And so you needed a reason to have to stop the car other than the things that you had observed because those were just not sufficient in and of themselves to stop that car.  Right?
>
> A: Yes.  I wanted to [call] the other officers so they could observe the vehicle and possibly observe a traffic violation so they could stop the car.

The government does not argue — or at least does not argue with much conviction — that these indicators themselves gave Trooper Schneider the right to stop defendants' car. Instead, the government relies heavily on what Trooper Schneider observed after he reentered Interstate Highway 35 and drove at a very high rate of speed (estimated by one defense attorney as approaching 100 miles per hour, Tr. 53) to catch up to defendants.[4] After defendants' car was again in sight, Trooper Schneider observed the car "weaving" in the right lane. Specifically, Trooper Schneider saw the car touch (but not cross) the right fog line once and touch (but not cross) the center dividing line twice. *Id.* at 21-22, 53-54. The government argues that this weaving — when considered together with the other "indicators of criminal behavior" discussed above — gave Trooper Schneider legal justification to stop defendants' car. In particular, the government argues that the weaving gave Trooper Schneider a reasonable, articulable suspicion that Billups was driving while impaired by alcohol or drugs.

The Court disagrees. There is no question that weaving — even perfectly legal weaving within a lane, such as the weaving observed by Trooper Schneider — can justify the stop of a vehicle. *See, e.g.*, *State v. Kvam*, 336 N.W.2d 525, 528 (Minn. 1983) ("[I]f an officer observes a driver weaving within his lane in an erratic manner, . . . then the officer is justified in stopping the driver to investigate the cause of the problem."); *State v. Ellanson*, 198 N.W.2d 136, 137

---

Tr. 51.

[4] It is curious that Trooper Schneider traveled at an extremely high rate of speed — something that undoubtedly put both himself and the other drivers on the road in some danger — in order to catch up to a car whose occupants, by his own admission, had not given him any objectively reasonable basis for suspecting criminal behavior. Judge Boylan regarded this as evidence that "at the moment he reentered the freeway at Clark's Grove, if not sooner, Trooper Schneider had already determined that he was going to stop the Pacifica, come hell or high water." Report and Recommendation 15.

(Minn. 1972) (per curiam) (holding that police officer had a right to stop a car that was "weaving within its lane," even though the officer "did not feel that this constituted a violation of the traffic laws."). But whether particular weaving by a particular driver justifies the stop of a particular car obviously depends on the facts of the case. The weaving observed by Trooper Schneider in this case did not give him the right to stop defendants' car, for at least three reasons:

First, prior to rushing to catch up to defendants' car, Trooper Schneider saw no reason to believe that Billups was driving while impaired, even though Trooper Schneider observed Billups's driving for a longer period of time before exiting at Clark's Grove than after getting back on Interstate Highway 35 and catching up to Billups and Burgess.[5] To the contrary, Billups gave no reason to believe that he was not in full control of his car. Tr. 47-48.

Second, the weaving that Trooper Schneider observed was minor. Billups did not cross either the fog line or the divider line. *Id*. at 53-54. He touched the fog line once and the divider line twice and on all occasions apparently brought the car back to the center of the lane quickly and smoothly. *Id*. at 21-22, 53-54. Even under normal weather conditions, Billups's momentary

---

[5]Judge Boylan described Trooper Schneider as following the defendants for a "five-mile stretch" before exiting at Clark's Grove, Report and Recommendation 4, and as following the defendants for "approximately one-half mile" after catching up to them again, *id.* at 3. The latter is clear from the transcript of the June 6 hearing. *See* Tr. 22, 54. The former is apparently based on Trooper Schneider's testimony that he was parked near mile marker 13 when he pulled onto the highway to follow a group of cars that included defendants', *id*. at 44-45, and that he got off the highway at the Clark's Grove exit, which is at mile marker 18, *id*. at 48; *see also id*. at 49. It is not clear, though, whether Trooper Schneider observed defendants' car for the entire five miles. At one point, Trooper Schneider testified that he had "visual contact" with defendants' car "for approximately a mile." *Id*. at 45.

and minor weaving was as likely to have resulted from daydreaming or adjusting the radio or talking on a cell phone as it was to have resulted from driving while impaired.

Finally and most importantly, the weather conditions were not normal. The day was extremely windy. According to defense counsel, the National Weather Service reported that, at the time defendants were pulled over, the wind was gusting to nearly 30 miles per hour. *Id.* at 87. Trooper Schneider did not dispute that claim,[6] and Officer Timothy Shanley agreed that "it was a very windy day." *Id.* at 149-50. The weather conditions are clearly evidenced by the

---

[6]Trooper Schneider testified as follows:

Q:   . . . [I]t was incredibly windy that day.  Is that right?

A:   It was windy, yes.

Q:   It wasn't just windy.  It was very windy.  It was like gusts of up to 29 miles an hour.  Would that be about right?

A:   If you have information that said it was 29 miles an hour I'll believe you.

Q:   Because that was consistent with your observations.  Right?

A:   It was windy, yes.

Tr. 55.  Later, Trooper Schneider was asked again about the windy conditions:

Q:   It was also extremely windy that day.

A:   It was windy, yes, ma'am.

Q:   And I have documents from the National Weather Service indicating that the . . . wind mile gusts were up to 29, 30 miles per hour.  Do you have any reason to dispute that?

A:   No, ma'am.

*Id.* at 87.

videotape of the stop: The wind whistles through Trooper Schneider's body microphone, making it difficult to hear him or the defendants; Trooper Schneider asks Billups to step out of the car because Trooper Schneider cannot hear him over the wind; papers almost blow out of Trooper Schneider's hands; Trooper Schneider has trouble hearing a cell phone because of the wind; wind-blown litter whips by along the side of the road; Officer Shanley tells Billups that he might have been stopped by Trooper Schneider because of the wind blowing his car, *see id*. at 150; and, when the doors of defendants' car are opened, paper and clothing fly out. *See* Pl.'s Ex. 2 (videotape of traffic stop).

A driver who allows his windshield wipers to beat furiously back-and-forth for several minutes on a dry, sunny day would certainly be acting suspiciously. The same behavior would not be the slightest bit suspicious during a downpour. Minor weaving such as that witnessed by Trooper Schneider might be suspicious on a calm day. But it is not suspicious when the wind is gusting to almost 30 miles per hour. Indeed, the fact that Billups had the car well under control — both before and after the Clark's Grove exit — is, if anything, evidence that he was *not* impaired.

The weaving observed by Trooper Schneider — even when considered together with the other behavior he witnessed — did not provide a reasonable, articulable suspicion of criminal activity, and therefore the stop of defendants' car was unlawful. For that reason, all of the evidence discovered after the stop of defendants' car must be suppressed as the "'fruit of the poisonous tree.'" *See Won Sung v. United States*, 371 U.S. 471, 488 (1963).

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, the Court OVERRULES the Government's Objections [Docket No. 64] and ADOPTS those portions of Judge Boylan's June 29, 2006 Report and Recommendation addressing the legality of the stop of defendants' vehicle [Docket Nos. 61, 62].  Accordingly, IT IS HEREBY ORDERED that:

1.  Defendant Stanley Lenier Billups's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 25] is GRANTED;

2.  Defendant Billups's Motion to Supress Statements, Admissions and Answers [Docket No. 26] is GRANTED;

3.  Defendant Robert Derek Burgess's Motion to Suppress Statements, Admissions and Answers [Docket No. 42] is GRANTED; and

4.  Defendant Burgess's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 44] is GRANTED.

Dated: July 25, 2006

s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge